IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PASTORI M. BALELE,

                 Plaintiff,

    v.

ANDREA OLMANSON, BOB CONNOR,
DEPARTMENT OF CORRECTIONS,
EDWARD F. WALL, GARY HAMBLIN,
J.B. VAN HOLLEN, JACK LAWTON,
JEAN NICHOLS, JERRY SALVO,
SCOTT WALKER, STEPHEN A. HERJE,
and THOMAS PIERCE,

                 Defendants.

OPINION & ORDER

13-cv-783-jdp

---

Plaintiff Pastori Balele applied for several jobs with the Wisconsin Department of Corrections, but he was not hired for any of them. Plaintiff filed a lawsuit in the Dane County Circuit Court contending that state officials discriminate against African Americans in the hiring process. His complaint also includes claims for malicious prosecution, denial of public accommodations, and invasion of privacy. Defendants removed the case to this court. Some of plaintiff's claims and some of the defendants were dismissed in an April 24, 2014 order. Dkt. 26. The remaining defendants have moved for summary judgment on all claims. I will grant that motion because plaintiff fails to present evidence to raise a genuine dispute as to any material fact. On the basis of this record, no reasonable jury could conclude that defendants have discriminated against plaintiff or violated his rights in any other way.

Before turning to the merits of defendants' summary judgment motion, I will resolve three preliminary matters. First, defendants seek sanctions against plaintiff for his violation of previous orders. Dkt. 32. Plaintiff has a long history of filing frivolous lawsuits, and he is

operating in this circuit under a sanction order that generally prohibits him from filing his own motions or making discovery requests.[1] Dkt. 29, at 1, 6. In this case, plaintiff was ordered to stop directly contacting individual defendants, after defendants showed that plaintiff had been "carbon copying" defendants on emails sent to their attorney. Dkt. 19, at 2.

Defendants now contend that plaintiff has continued to correspond with defendants and that he has made discovery requests even after being told he should not. Defendants have submitted several rounds of communications to support their claims for a sanction.[2] Although the original motion requested only an order to show cause why the court should not issue a protective order to prevent future violations, in a later filing defendants say that no sanction short of dismissal will do. Plaintiff indeed sent unauthorized discovery requests, but those were easily ignored by counsel. *See* Dkt. 61-1, at 3-4. Plaintiff should not have communicated directly with any defendant about this suit, but most (although not all) of plaintiff's communications appear to relate to subsequent state jobs that are not the subject of this lawsuit. Thus, it is not entirely clear whether plaintiff repeatedly and intentionally violated this court's order about communication with defendants. After examining the

---

[1] The Court of Appeals for the Seventh Circuit has sanctioned plaintiff by directing all courts of the circuit to reject filings by plaintiff until he pays off the substantial costs he has incurred in litigating previous frivolous cases, and unless he files an affidavit certifying that the matters he raises in the proposed filing are not frivolous and have not been raised in previous suits. *Balele v. Barnett*, Case No. 96-1133 (7th Cir. Apr. 29, 1997). In situations in which a defendant removes a civil action originally filed by plaintiff in state court, this court has interpreted the sanction order to generally limit plaintiff's ability to file documents proactively, but it has allowed him to file responses to motions filed by the defendant. *See Balele v. Sears, Roebuck and Co.*, 12-cv-140-slc, at 1-2 (W.D. Wis. May 23, 2012).

[2] Defendants have filed two motions to supplement their original motion with further examples of plaintiff's communications. Dkt. 36, 38. I will grant these motions to allow the supplementation.

parties' submissions, I will deny defendants' request for sanctions, because there would be little point in sanctioning plaintiff for these transgressions at this point, when I will grant defendant's motion for summary judgment and dismiss plaintiff's case on the merits.

Still, defendants and the court have been put to the burden and expense of yet another frivolous lawsuit by plaintiff. Therefore, although I will deny defendants' request for sanctions for the particular violations mentioned above, at the conclusion of this opinion I will impose a new requirement on plaintiff that is intended to expeditiously weed out any meritless claims in future cases involving plaintiff that might be removed to this court.

Second, plaintiff has filed a sur-reply to defendants' summary judgment motion. I will construe this document as including a motion for leave to submit such a document, because this court generally does not allow sur-replies. I will grant the motion because the sur-reply adds some clarity to plaintiff's positions and because it does not prejudice defendants, given that I will nevertheless grant their motion for summary judgment.

Third, defendants ask me to disregard any of plaintiffs' responses to defendants' proposed findings of fact that are supported by plaintiff's "affidavit." Dkt. 61-1, at 115. Plaintiff's proffered affidavit is neither a valid affidavit nor declaration. Defendants contend that original version of the document is not notarized (although the version attached to plaintiff's sur-reply is, see Dkt. 67) and that plaintiff fails to recite that the substantive statements are true and made under penalty of perjury. Rather, plaintiff states (both in the original version and the version attached to his sur-reply) that the statements are only true "to the best of [his] recollection," which is technically insufficient. *See Wills v. Potter*, 2008 WL 821921, at *11 n.10 (N.D. Fla. Mar. 27, 2008) ("A declaration expressing that statements are true to the best of one's recollection carries with it the implication that the

affiant does not know whether the statements are true and correct and the affiant does not wish to be held accountable if they are not.").

I will not disregard plaintiff's affidavit, despite its irregularities. I am reluctant to disregard a *pro se* litigant's evidence without giving the litigant every opportunity to rectify problems with the form by which that evidence is submitted. In this case, even if I credit plaintiff's affidavit statements as having been properly certified, plaintiff's evidence has multiple other admissibility problems, particularly that it is based on a great deal of hearsay. Ultimately, even if I overlook the problems with the form of plaintiff's affidavit, summary judgment must be granted to defendants.

## FINDINGS OF FACT

Plaintiff Pastori Balele is an African American resident of Madison. Most of the defendants are current or former Wisconsin Department of Corrections (DOC) employees: Edward Wall is the current DOC secretary, Robert Conner is a human resources specialist, Jerry Salvo is a financial manager, Gary Hamblin is a former DOC secretary, Jean Nichols was the human resources director, Thomas Pierce was a purchasing agent management supervisor, and Andrea Olmanson was assistant legal counsel.

The remaining individual defendants are current or former statewide office holders or employees for other state agencies: Scott Walker is the governor, J.B. Van Hollen was the attorney general, Jack Lawton was the administrator of the Division of Merits Recruitment and Selection at the state Office of State Employment Relations, and Stephen Herje is an equal rights officer at the Department of Workforce Development.

Plaintiff's claims relate to his applications for several "classified positions" with the DOC. Generally, under Wisconsin law, state governmental jobs in the "classified service" are filled using competitive examinations and interviews. The result of "passing" a competitive examination is being certified for a possible interview. The exam scores or rankings are not shared with interview panels or other hiring decision makers. There are ways that a classified position may be filled by a person who never took a competitive examination for that position or who never had a formal job interview, although none of the provisions cited by either party appears to allow the DOC to skip the exam and interview process to directly hire a new employee to meet affirmative action goals.[3]

Part of the state's "statement of policy" regarding "state employment relations," Wis. Stat. Ch. 230, is that "[i]t is the policy of this state to take affirmative action which is not in conflict with other [hiring provisions]." Section 230.01(2). The administrator of the Division of Merit Recruitment and Selection in the Office of State Employment Relations "may, to meet affirmative action objectives, establish such recruitment, examination and certification procedures for positions in the department of corrections as will enable the department . . . to

---

[3] Defendants provide the following examples of laws enabling a person to be hired without a competitive examination: Wis. Stat. § 230.15 (ways that classified positions may be filled without competitive examination); Wis. Admin. Code § ER-MRS 12.02 (same); Wis. Stat. § 230.24(2) (alternative ways to fill career executive positions); Wis. Stat. § 230.275 (certain disabled veterans appointed "on a noncompetitive basis"); Wis. Admin. Code § ER-MRS 12.07 (certifications with tests being waived); § ER-MRS 13.045 (probationary employee filling classified position); and § ER-MRS 27.06 (examination waivers allowed for "exceptional" employment lists). Defendants give the following examples of laws enabling a person to be hired without an interview: Wis. Admin. Code § ER-MRS 15 (transfers), § ER-MRS 16 (reinstatements and restorations), § ER-MRS 17 (demotions), § ER-MRS 22.025 (filling vacancies when prior layoffs involved), § ER-MRS 22.09 (employment offer in lieu of layoff), § ER-MRS 22.10 (restoration), § ER-MRS 22.11 (reinstatement), § ER-MRS 30.07 (career executive reassignment) and § ER-MRS 30.08 (career executive transfer).

increase the number of employees of a specified gender or a specified racial or ethnic group in those positions." Section 230.213.

When determining whom to interview, agencies may be given "additional names of qualified applicants from affirmative action groups in order to comply with an approved affirmative action plan . . . ." Wis. Admin. Code § ER-MRS 8.05. The DOC's "Executive Directive 4" requires a "hiring justification" for positions that are "currently underutilized for women and/or minorities," supervisory and management positions, and jobs "at pay range 15 or above." Under this directive, if the DOC's affirmative action officer disagrees with the hiring justification provided by an appointing division administrator, then the secretary of the DOC makes the final decision between competing candidates. "Executive Directive 6," titled "Use of Balanced Examination and Interview Panels," states in part:

> A balanced interview panel includes representatives of at least two of the three affirmative action target groups (women, racial/ethnic minorities and persons with disabilities). At a minimum, an effort should be made to ensure that panels which interview target group members include a member of that target group. For example, we try to avoid having a female candidate interviewed by an all-male panel, or a minority candidate interviewed by an all-white panel.

## A.      First job application

On December 1, 2010, the DOC posted a "contracts specialist-advanced" position. Six applicants completed the certification exam and five current state employees submitted a transfer referral. Out of the six applicants who completed the exam, plaintiff ranked fourth. On about January 18, 2011, plaintiff interviewed for the position. The three-person interview panel included defendant Pierce. Plaintiff was one of six candidates interviewed for the position. At the end of an interview, Pierce tells every candidate that he will be in touch with

the hiring decision. Plaintiff states that Perce told him that he would respond within two weeks.

Plaintiff was not the best qualified candidate for the position. In DOC interviews, each response to a question is graded by each interviewer as either "more than acceptable," "acceptable," or "less than acceptable." Pierce ranked three of the four interview question responses of plaintiff's as "less than acceptable" and one response as "acceptable." The other two interviewers ranked all four responses as "less than acceptable." Three of the six interview candidates were selected for a second interview, which were conducted on February 16, 2011. Plaintiff was not selected for this round of interviews.

On March 16, 2011, defendants Pierce and Conner received an email from plaintiff asking about the status of the hiring decision. Plaintiff also copied defendant Hamblin, Chief Legal Counsel Kathryn Anderson, and "govgeneral@wisconsin.gov" (it seems that plaintiff was attempting to copy defendant Van Hollen, but this is not his email address). Plaintiff wrote, "Please let me know the update for my interview for the above position. In case I was not selected, I am asking DOC to allow me view notes and recommendations of interviews . . . ." That same day, Pierce sent plaintiff and all other non-selected candidates a letter informing each of them that the hiring decision was finalized and the selected candidate "will provide [DOC] with an extensive healthcare background and experience in this key role." Dkt. 46-5.

Defendant Conner forwarded plaintiff's March 16 email to defendant Nichols because she was responsible for processing open records requests related to personnel matters at the DOC central office. About March 19, 2011, Nichols signed a DOC-1160 Record Request Response denying plaintiff's request. On the form, Nichols stated that she was denying the

request because the information plaintiff sought was confidential pursuant to Wis. Stat. 103.13(6) and her analysis of the request using the "common law balancing test."

In late March 2011, plaintiff sent emails to defendants Nichols, Conner, Hamblin, Van Hollen, Walker, and Pierce, as well as non-defendant Anderson, seeking reconsideration of the public records request. It was not Van Hollen's practice to respond to public records requests sent to another state agency, and the Office of the Governor routinely disregards records requests when the governor is only "carbon copied," or if the message does not seek the office's own records. On March 24, 2011, Anderson responded to plaintiff, stating that plaintiff needed to submit a copy of the original request and response. Neither party explains how plaintiff responded to Anderson.

At some point in the hiring process, it was discovered that the February 16, 2011 interview panel was "not balanced," which I understand to mean that the panel did not satisfy DOC policy by including "representatives of at least two of the three affirmative action target groups (women, racial/ethnic minorities and persons with disabilities)." Dkt. 64-3. On March 25, 2011, defendant Conner sent plaintiff and all other candidates from the first interview an email advising them that the position had been reopened and asked them if they were interested in a re-interview for the position. At the time Conner sent this email, no candidate had been selected for the position or offered the position.

On March 29, 2011, plaintiff came to DOC headquarters for the re-interview. The interview panel consisted of three DOC employees, including an African American employee. None of the members on the re-interview panel were on the original panel. Plaintiff entered the interview room and asked where his office was located. A member of the panel told plaintiff that he was brought back to the DOC for a re-interview. Plaintiff responded, "I

8

thought you were going make me an offer" and added, "I am not going through any more fake interviews and you people treat black people like dogs." Plaintiff showed the panel an article in National Geographic illustrating a picture of a black person "all painted up in shackles" and said, "This is what all you white people think of black men/people." Dkt. 63, at 50. Another member of the interview panel told plaintiff that he would not be eligible for the position unless he was to interview. Plaintiff said, "no" and walked out.

The interview panel offered the position to another candidate, who the members felt was best qualified based on candidates' performances in the re-interviews.

**B.      Petition for temporary restraining order**

On July 22, 2011, defendant Olmanson, working as assistant legal counsel for DOC, filed a "Petition for Restraining Order and/or Petition and Motion for Injunction Hearing" against plaintiff in the Dane County Circuit Court. In the petition, Olmanson alleged that plaintiff had brought repeated vexatious litigation and harassed DOC staff during the job selection process. She also alleged that plaintiff had made public comments indicating that he was not seriously seeking a job with the DOC. Several days prior, Olmanson had observed a series of comments by plaintiff on the website The Huffington Post and attached a "screen shot" of the posting to an affidavit that she filed in support of the petition. In the comments, plaintiff suggested that he was not sincerely looking for a job and stated that he was "too old to work for somebody else." Dkt. 49-2, at 2. On July 22, 2011, a court commissioner entered a temporary restraining order barring plaintiff from applying for DOC jobs or otherwise harassing DOC employees. However, on July 29, 2011, following a hearing, the presiding judge dismissed the case after determining that DOC had not met its burden of proof.

**C.    2013-14 job applications**

On April 26, 2013, plaintiff interviewed for a "correctional management services director" position. Plaintiff was one of 24 candidates identified via a statewide career executive candidate roster and he was one of 18 candidates interviewed for the position. Two interviewers ranked plaintiff's answers to each question as less than acceptable and one ranked all but one question as less than acceptable. Plaintiff ranked thirteenth among the first-round interviewees and was not selected for a second interview. The position was offered to the applicant who the panel felt was best qualified based on candidates' performances in their interviews.

On June 4, 2013, plaintiff interviewed for a "correctional services manager" position in the Bureau of Correctional Enterprises. Plaintiff was one of 11 candidates interviewed for the position. All three interviewers ranked plaintiff's overall score as less than acceptable. Each interviewer ranked plaintiff's responses to three of five questions as less than acceptable and two of five questions as acceptable. The position was offered to the applicant who the panel felt was best qualified based on candidates' performances in their interviews.

On June 6, 2013, plaintiff interviewed for a "correctional services manager, director of program services" position. Plaintiff was one of 14 candidates interviewed for the position. All three interviewers ranked plaintiff's answers to each question as less than acceptable. The position was offered to the applicant who the interview panel felt was best qualified based on candidates' performances in their interviews.

On July 8, 2013, plaintiff emailed DOC human resources coordinator Cheryl Amato, requesting the status of the hiring decision for two positions he applied for and copies of the interviewer's notes from those interviews. Plaintiff copied defendants Olmanson, Walker,

10

Wall, Van Hollen, Nichols, Lawton, and other officials. On July 10, 2013, non-defendant employee Kari Heilman completed a DOC-1160 form denying plaintiff's public record request. The form stated the reason for denial as confidentiality under Wis. Admin. Code § ER-MRS 6.08 and Wis. Stat. § 19.36.

Plaintiff's claims in this case concern the job he interviewed for in 2011 and the three he interviewed for in 2013. Plaintiff applied for a fifth job in 2014, a "contracts specialist-advanced" position.[4] Although plaintiff had the highest score on the exam for this position, he was not given an interview. The DOC's "recruitment activity plan" for the job stated that the job was not part of a job group "underutilized" by racial minorities. Dkt. 61-17. The applicant who got the job was a transferred state employee rather than new hire. *Id*.

## D.    Equal rights complaints

In late 2011, plaintiff submitted two equal rights complaints to the Wisconsin Department of Workforce Development (DWD). One of the complaints appeared to have been regarding a job in the private sector, while the other appears to have been a complaint about plaintiff's 2011 application with the DOC.

On December 6, 2011, defendant Herje sent plaintiff a letter stating that he had received plaintiff's complaints but they could not be accepted because a 2002 State Personnel Commission order barred plaintiff from filing discrimination complaints until he fully complied with several circuit court orders requiring him to reimburse the state for legal costs

---

[4] Plaintiff's application for this position postdates his civil complaint, and plaintiff never moved to supplement his complaint to include claims about defendants' treatment of this application. Nonetheless, I include information about this position because, as is discussed in more detail below, plaintiff argues that defendants' handling of this hiring cycle is relevant to show their discriminatory intent with regard to the positions that are in dispute in this lawsuit.

incurred in defending claims the courts deemed frivolous. Herje rejected a complaint filed by plaintiff in July 2013 on the same grounds.

Herje also used the 2002 sanctions order as justification to reject a 2012 complaint by plaintiff against private employer PDQ Food Stores. After plaintiff filed a lawsuit to compel the DWD to accept the complaint, the state agreed to accept the complaint, acknowledging that the sanctions order applied only to complaints against governmental employers. The state court dismissed the lawsuit based on the parties' stipulation to dismiss.

ANALYSIS

A.    **Standard of review**

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, plaintiff "must set forth specific facts showing that there is a genuine issue for trial." *Id.* He may not simply rely on the allegations in his pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [his] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996) (citations omitted).

B.    **Personal jurisdiction**

Defendants contend that they should be granted summary judgment because plaintiff failed to obtain personal jurisdiction over them by properly serving them with the complaint. Based on the parties' submissions, it seems likely that plaintiff indeed failed to follow

Wisconsin service rules, but I conclude that it is too late in the litigation for defendants to raise this argument. Several of the defendants (also represented by the state) were earlier dismissed from the case after responding to the complaint with a motion to dismiss rather than answer. *See* Dkt. 6, 26. The remaining defendants chose to answer the complaint and stated that they contemplated filing a motion for judgment on the pleadings at a later time because plaintiff still had time to cure service defects. Dkt. 5, at 2. However, they waited roughly a year after plaintiff's 120-day time limit for service under Federal Rule of Civil Procedure 4(m) ran out, and moved for dismissal on personal jurisdiction grounds at the same time they addressed the merits of plaintiff's claims.

Parties can waive a valid personal jurisdiction or service defense by failing to timely raise it or by participating in the district court proceedings. *See, e.g.*, *Blockowicz v. Williams*, 630 F.3d 563, 566 (7th Cir. 2010); *O'Brien v. R.J. O'Brien & Associates, Inc.*, 998 F.2d 1394, 1399 (7th Cir. 1993). Thus, although defendants complied with the letter of Rule 12(h) by including the defense in their answer, I conclude that they have waived the defense because "they did not comply with the spirit of the rule, which is to expedite and simplify proceedings in the Federal Courts." *Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993) (citations and quotations omitted).

## C.   Employment discrimination

The core of plaintiff's case concerns decisions by DOC staff not to hire plaintiff for any of four jobs that he had applied for: a "contracts specialist-advanced" position in 2011; and three "correctional management services" positions in 2013. In his complaint, plaintiff stated that he was bringing equal protection and due process claims under 42 U.S.C. § 1983 regarding these hiring decisions. That part of plaintiff's complaint is clear enough.

But plaintiff's complaint did not explicitly include claims under Title VII of the Civil Rights Act, and the parties now dispute whether plaintiff can pursue Title VII claims in this lawsuit. Defendants focus much of their briefing on their arguments that defendant DOC cannot be sued under § 1983 and that plaintiff fails to adequately explain how each of the individual defendants, particularly Governor Scott Walker and former Attorney General J.B. Van Hollen, were involved in the deprivations of rights alleged in this case.[5] In his response brief, plaintiff states that he indeed wishes to pursue Title VII claims.

*Pro se* plaintiffs are generally not required to plead particular legal theories, *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005) ("particularly since [plaintiff] filed his complaint pro se, he should not be held to the . . . incorrect theor[ies] he did name."). I will not hold plaintiff to the theories he articulated in his complaint. In a closer case, I might ask defendants to submit supplemental briefing on whether they had notice of plaintiff's previously unarticulated Title VII claims. But the analysis of this case under Title VII is so similar to that of plaintiff's equal protection claims that further briefing would be unnecessary and wasteful. *See Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 926 (7th Cir. 2007). Under either equal protection or Title VII theories of recovery, plaintiff does not come close to showing that defendants discriminated against him on the basis of race.

The analysis for equal protection and Title VII claims is the same; the only difference is that a Title VII claim is against an employer, whereas an equal protection claim is against

---

[5] Defendants argue persuasively that plaintiff fails to present evidence supporting his allegations that certain defendants were personally involved in the hiring decisions or other actions plaintiff mentions in his complaint. Because I conclude that plaintiff fails to show that *any* of the defendants have violated his rights, I need not parse through plaintiff's claims to determine whether each defendant was personally involved in each individual claim. For similar reasons, I need not address defendants' argument that they are entitled to qualified immunity on several of plaintiff's claims.

individual employees. *Id*. A plaintiff can prove discrimination by using either the "direct" or the "indirect" method of proof. *Darchak v. Chicago Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009). In any employment discrimination case, the central question is "whether the employer would have taken the same action had the employee been of a different race (age, sex, religion, national origin, etc.) and everything else had remained the same." *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 540 (7th Cir. 2005) (quotation and citation omitted). Plaintiff does not explain whether he is attempting to proceed under either the direct or indirect methods, so I will consider both, starting with the indirect method.

### 1.    Indirect method

Under the indirect method of proving discrimination, plaintiff must establish a *prima facie* case consisting of four elements: (1) he was a member of a protected class; (2) he applied for an open position for which he was qualified; (3) he did not receive the position; and (4) those who were hired were not in the protected class and had similar or lesser qualifications. *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 444 (7th Cir. 2014); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

If a plaintiff satisfies all four prongs of the *prima facie* case, then the burden shifts to the defendant "to produce a legitimate, noninvidious reason for its actions." *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008). If the defendant rebuts the *prima facie* case, the burden shifts back to the plaintiff to show that the reasons proffered by the defendant are merely pretextual. *Id*.

Defendants do not explicitly challenge plaintiff's ability to state a *prima facie* case. Rather they contend that the hiring decisions were made for legitimate reasons and that plaintiff cannot show that those reasons were pretextual.

15

Pretext "means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). "In order 'to show pretext, a plaintiff must show that (1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent.'" *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008)). "If the plaintiff uses indirect evidence to meet his burden, he must show that the employer's reason is not credible or factually baseless." *Id*. The plaintiff must also provide evidence supporting the inference that the employer's real reason for the decision was discriminatory. *Id*. at 901-02. Even if the defendant's decision was unreasonable, pretext is not established where the decisionmaker honestly believed the nondiscriminatory reason. *Id*. at 902. "This is because courts are not 'superpersonnel department[s]' charged with determining best business practices." *Id*. (quoting *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005)). The decision to favor one job applicant over another can be "mistaken, ill-considered or foolish, [but] so long as [the employer] honestly believed those reasons, pretext has not been shown." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)).

In support of their argument that plaintiff was rejected for the jobs for legitimate reasons, defendants submit documents showing how the applicants' interview answers were evaluated by each member of the respective interview panels. Each answer was graded "more than acceptable," "acceptable," or "less than acceptable." The summaries provided by defendants show that the vast majority of plaintiff's interview responses were evaluated to be "less than acceptable," and in each job cycle there were at least several applicants with better

16

evaluations. I conclude that defendants have rebutted plaintiff's *prima facie* case by showing a legitimate non-discriminatory reason for not hiring plaintiff.

Plaintiff argues that because the DOC does not always use the interview process to hire an applicant, the use of negative interview evaluations to reject his applications was a pretext for racial discrimination. He adds that there is a DOC "executive order" authorizing the DOC secretary to hire applicants regardless of their interview scores. He also seems to be arguing that the DOC circumvented its own affirmative action procedures. He states that "[he] know[s] there is DOC policy and procedure guiding all hiring officials, legal counsel to forward the name of interviewed racial minorities if not selected along with the selected individual if White to DOC Secretary for his independent decision to racially balance DOC work force."

Plaintiff's arguments fail for several reasons. First, plaintiff fails to show that there are any DOC policies about interviews that say what he says they do. He seems to believe that he could have been appointed to the positions at issue in this case without an interview, but plaintiff fails to point out any state statute, administrative provision, or policy that would allow him to be appointed without an interview. Defendants have pointed out some statutes and regulations that might allow for such an appointment, but none of them appear to apply to plaintiff. Plaintiff wholly fails to show how he could have been appointed to any of the positions that he sought without an interview.

Even if there were such a policy, to prevail on his equal protection or Title VII claims, plaintiff would need to show that a selective application of that policy was motivated by racial animus. Plaintiff states that "[he] had heard 3 Wisconsin agency heads testify that they had given jobs to friends in club bars." Dkt. 61, at 20. Besides the questionable admissibility

of this statement (it is based on hearsay), plaintiff does not explain its relevance: he does not suggest that any current DOC employees made these statements or that the statements referred to the DOC jobs at issue in this case. Rather, plaintiff seems to be referring to decade-old hiring decisions involving none of the current decisionmakers at the DOC.[6]

Plaintiff also discusses a 2014 "contracts specialist-advanced" job for which he ranked first on the exam but was not given an interview. Plaintiff states that a white person was hired without an interview. Plaintiff's complaint does not include a claim regarding this job, but the handling of the 2014 position *could* be relevant to the question of disparate treatment of applicants of different races. However, plaintiff does not provide evidence showing that the recipient of the 2014 job actually received it without an interview. Nor does plaintiff show that he and the recipient of the 2014 job are similarly situated (the recipient was already a DOC employee who transferred to that position, whereas plaintiff would have been a new hire). Plaintiff argues that the state falsely stated that this position was not part of a job group "underutilized" by racial minorities, and he attempts to prove this by providing a "Statewide Job Group Underutilization Table," Dkt. 61-1, at 76, which he states contradicts the state's classification of the job. But the table does not include an explicit category for "contracts specialist-advanced" positions, and plaintiff does not explain what category listed

---

[6] In his affidavit, plaintiff refers to state hiring decisions being influenced by "Secretary Bugher" (whom I understand to be Mark Bugher, former secretary of administration, Wis. Blue Book 300 (1999-2000) and secretary of revenue, Wis. Blue Book 505 (1995-96)), John Litscher, former secretary of the DOC, Wis. Blue Book 346 (2001-02), and James Klauser, former secretary of administration. Wis. Blue Book 335 (1995-96). These claims appear to have been litigated in a series of cases in the 1990s. *Balele v. Klauser*, 1996 WL 15825 (7th Cir. Jan. 11, 1996). Plaintiff does not provide a plausible argument that the actions of these former officials should be considered in analyzing the hiring decisions at issue in this case.

in the chart covers that job. Plaintiff's unsupported speculation does not raise a genuine issue of fact concerning whether the 2014 position was an underutilized position.

If plaintiff could show that defendants circumvented their own affirmative action policies, that might raise a reasonable inference of discretionary animus, but none of the policies or procedures plaintiff cites say what he believes they do. Plaintiff states:

> According to DOC policies also known as Executive Orders when underutilized positions have among the interviewees Blacks, the supervisor of the position had to meet Nichols and Affirmative Action Officer to discuss why Blacks and other racial minorities were not selected. Then the supervisor of the position would go the Legal counsel to make his/her case for not hiring a Black person. Then Legal counsel would allow the supervisor to send resume of Blacks and that of the hired person if Caucasian to DOC secretary.

Dkt. 63, at 55-56. Plaintiff also states that "Mr. Wall, not the Deputy Secretary, had the final executive decision regardless of interview results or score." *Id*. at 2. I understand plaintiff to be arguing that the secretary chose not to intervene in the hiring decisions, in violation of the DOC's affirmative action policies. But plaintiff does not produce any policy stating that the secretary should have intervened in the jobs at issue in this case. One of the affirmative action policies provided by defendants, "Executive Directive 4," indicates that when the DOC's affirmative action officer disagrees with the "hiring justification" provided by an appointing division administrator, the secretary has final say over that hiring decision. Dkt. 64-2. Even assuming that this policy applies to the jobs at issue in this case,[7] plaintiff does not raise a reasonable inference that the policies were disregarded, because he does not

---

[7] The affirmative action policies produced by defendants apply to positions that are "underutilized for women and/or racial and ethnic minorities," supervisory positions, or positions above a certain pay level. Dkt. 64-2, at 2. Plaintiff attempts to show that the positions at issue here were all "underutilized" positions by providing the underutilization table mentioned above. Dkt. 61-1, at 76. It is not clear from the table that the positions plaintiff applied for were indeed underutilized, although at least some of the positions at issue appear to be supervisory positions.

adduce any evidence either that the state failed to make a hiring justification or that the affirmative action officer disagreed with the justification, such that the secretary would be brought into the decision. Defendants do not provide a clear picture of how the policies were or were not followed, but it is not their burden to do so; it is plaintiff's burden to show pretext. Plaintiff argues without evidentiary support that the DOC affirmative action officer is white, but this fact, even if true, does not prove any racial animus on behalf of the officer, defendants, or any other DOC employee.

Plaintiff's lawsuit seems to be motivated at least in part by his belief that he "knew he had done the best at [the 2011] interview," Dkt. 60 at 6, and that he "had done very well at [the 2013] interviews," Dkt. 60, at 10. He states that, "when giving his interview, he heard two of the interviewer's verbal remark as: 'excellent, very good.'" Dkt 63, at 51. But as explained above, this court does not sit as a "superpersonnel department," reviewing business decisions and plaintiff's own assessment of his performance in the job interviews is not evidence of discrimination on defendants' part. *Cf. Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001) ("in our many cases discussing the nature of the pretext inquiry, we have stated that it is not enough for a plaintiff to show that his employer's explanation was based on an inaccurate assessment of its employee's performance."). Plaintiff's subjective belief that the interviews went well, based on stray remarks from interviewers, is immaterial. Plaintiff's subjective view of his own qualifications and performance does raise a factual issue for trial.

In his complaint, plaintiff discusses a number of actions related to the hiring decisions at issue. It is unclear whether plaintiff discusses these events as a way of showing pretext or intends to raise them as standalone discrimination claims. I conclude that these actions,

whether considered as individual acts of discrimination, or taken as a whole as evidence of discriminatory purpose, do not create a disputed issue of fact for trial. I will discuss each action individually within the pretext section of this opinion, although the analysis would apply equally to standalone discrimination claims based on each action.

### a.    Re-interview for 2011 position

Plaintiff alleges that defendant Conner, "with consultation with [defendant] Hamlin," asked plaintiff to come back to re-interview for the 2011 position, after it was discovered that the interview panel was "unbalanced." Plaintiff surmises that "unbalanced" means that all panel members were white, which is supported by an executive directive submitted by defendants indicating that the DOC "tr[ies] to avoid having . . . a minority candidate interviewed by an all-white panel." Dkt. 64-3, at 1. On the face of it, the unbalanced initial panel is insufficient to show racial discrimination, because the DOC attempted to fix that problem by redoing the interviews.

But plaintiff believes that the re-interview process was a sham because the person selected for the job had already started working by the time of plaintiff's second interview. I understand plaintiff to be arguing that the DOC's effort to go through sham interviews is evidence of pretext, which would imply that the actual hiring decision was made for discriminatory reasons.

The problem with this theory is that plaintiff fails to provide admissible evidence that the selected candidate had already started working. Plaintiff responds to defendants' proposed finding that the job had not already been filled with the statement that he "could see interviewers turn red when [he] asked to be shown where [he] would sit if selected. Once the interviewers refused, [he] remembered his experience in the past. (Balele affidavit No.

21

7).” Paragraph 7 of plaintiff's affidavit refers to the decade-old allegations of impropriety among state agencies in which I understand plaintiff to be saying that at some point in the past he lost out on jobs to persons who were hired before plaintiff even had a chance to interview. *See supra* note 5. This is nothing more than plaintiff's hunch that the job had already been filled, which does not place defendants' proposed finding in dispute. *See Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (“guesswork and speculation are not enough to avoid summary judgment.”). Plaintiff also states in his affidavit, “Several days after I had been at DOC to re-do the interview, I heard that somebody was already a white woman at the desk working.” Dkt. 61-1, at 117.[8] However, this statement is inadmissible hearsay: plaintiff provides no indication of who told him this, or whether that person was speaking from personal knowledge, so it cannot create a factual dispute for trial.

### b.    Delay in notification

In his complaint, plaintiff alleges that defendants Pierce and Nichols “intentionally did not inform [plaintiff] about the [2011] interview result to keep him in the dark because . . . he was Black. Dkt. 2-4, at 2. Plaintiff was notified that he did not get the job two months after his interview rather than the two-week timeline plaintiff claims that Pierce gave him. Plaintiff also alleges that unnamed defendants failed to promptly inform him about the 2013 hiring decisions. It is difficult to identify the harm to plaintiff, even if the delay in notification was racially motivated. But plaintiff fails to assert facts that could lead a jury to conclude that any defendant racially discriminated against him. Plaintiff fails to rebut defendants' proposed finding that plaintiff was informed of the 2011 decision at the same

---

[8] Plaintiff also states that the person hired for this job was “ineligible,” Dkt. 63, at 76-77, but he does not present any evidence supporting this assertion.

time as the other unsuccessful candidates. Plaintiff calls this a lie and says that defendants responded only after he sent an email to DOC officials, but this does not raise a reasonable inference that plaintiff was sent the information later than white candidates. Neither party submits any findings about the 2013 hiring decisions, but it is plaintiff's burden to show that he was treated differently. He fails to do so.

### c.    Open records requests

Plaintiff alleges that defendants Conner, Nichols, Hamlin, Van Hollen, Walker, Lawton, and Wall denied his requests to view the interviewers' notes and recommendations pertaining to his various job applications. Nichols denied his request regarding the 2011 job pursuant to Wis. Stat. § 103.13(6) (employee prohibited from seeing "[a]ny portion of a test document . . . [or] [m]aterials used by the employer for . . . promotions and job assignments or other comments or ratings used for the employer's planning purposes") and the "common law balancing test" for open records requests. *See Hempel v. City of Baraboo*, 2005 WI 120, ¶ 28, 284 Wis. 2d 162, 699 N.W.2d 551 ("If neither a statute nor common law creates a blanket exception, the custodian must decide whether the strong presumption favoring access and disclosure is overcome by some even stronger public policy favoring limited access or nondisclosure."). Non-defendant Kari Heilman denied plaintiff's request pertaining to the 2013 jobs, stating that the request was barred by Wis. Stat. § 19.36 (employees prohibited from seeing "[i]nformation pertaining to an employee's employment examination") and Wis. Admin. Code § ER-MRS 6.08 (examinee prohibited from access to material such as written comments of examination raters, ratings guides, and scoring keys).

Plaintiff argues that he was not a DOC employee, so the provisions cited in the denials did not apply to him. It is disputable whether plaintiff or defendants are correct in

their interpretations of the provisions mentioned above, but for purposes of his discrimination claims it does not matter whether defendants correctly interpreted Wisconsin law. The question is whether defendants' stated reasons masked the actual, discriminatory reason for the decision. *Stockwell*, 597 F.3d at 901-02. There is no evidence that Nichols or Heilman disbelieved their stated reasons for denying the requests, treated other open records requesters better than plaintiff, or otherwise acted with discriminatory animus.

Plaintiff also blames the other supervisory defendants for failing to intervene in the open records decisions, but he presents no evidence suggesting that these officials would normally intervene but declined to do so here, nor does he adduce any other evidence suggesting that there was a discriminatory animus behind the DOC's response to the open records requests.

### d.   Petition for injunctive relief

Plaintiff argues that defendant Olmanson's decision to seek a court order enjoining plaintiff from applying for DOC jobs shows the DOC's discriminatory animus. Olmanson's stated reason for seeking injunctive relief is clear from the face of the state-court petition: Olmanson stated that plaintiff seemed to apply for jobs with state agencies for the purpose of harassing state officials, given his lengthy history of litigation against state agencies, the 2011 re-interview where plaintiff walked out, and his Huffington Post comment that he was not really seeking a job with the DOC. Dkt. 49-2.

Plaintiff fails to present any evidence showing this rationale to be a pretext. His main argument is that defendants are foreclosed from raising their non-discriminatory rationale under the *Rooker-Feldman* doctrine, because the state court heard Olmanson's rationale and dismissed the petition. The *Rooker-Feldman* doctrine is a restriction on the ability of a plaintiff

24

to attack state-court judgments; *Rooker-Feldman* is not an offensive tool to be used against a defendant in federal court. *Centres, Inc. v. Town of Brookfield, Wis.*, 148 F.3d 699, 702 (7th Cir. 1998) (Federal courts applying the doctrine consider "whether the injury alleged by the federal *plaintiff* resulted from the state court judgment itself or is distinct from that judgment." (emphasis added)). Perhaps plaintiff means to say that the principle of issue preclusion blocks defendants from raising this argument, but that argument goes nowhere. Plaintiff does not provide a transcript of the hearing at which the case was dismissed, but his own accounting of what happened at the hearing does not show that the state court considered Olmanson's actions to be a result of discriminatory intent. Rather, the state court simply did not buy Olmanson's argument that plaintiff was unqualified for the positions he kept applying for, and concluded that the DOC failed to meet the high burden of granting injunctive relief against plaintiff. At most, a ruling that injunctive relief was unjustified tends to show that Olmanson's desire for an injunction against Balele was ill-conceived; it does not show that Olmanson was lying about her reason for bringing the lawsuit or that Olmanson or anyone else at the DOC sought the injunction for discriminatory reasons.[9]

Plaintiff also contends that Olmanson violated his privacy by searching for the Huffington Post comment, that he was served the lawsuit by a white person while plaintiff was at work, and that "[he] was later told that Defendants had invited news people to defame and humiliate [him] if the court ruled against [him]." Plaintiff's assertion about the invitation of media is inadmissible hearsay. In any case, none of these allegations raise a

---

[9] I note that in his complaint, plaintiff alleges that "[o]ne of DOC Defendants brief said that Defendants did not want to hire Blacks and especially Balele." Dkt. 2-4, at 5. I understand plaintiff to be talking about a brief filed in plaintiff's appeal of the dismissal of a counterclaim plaintiff sought to bring in the temporary restraining order case. Defendants have submitted the state's brief, Dkt. 5-22, and it, perhaps unsurprisingly, does not say anything remotely suggesting that the DOC did not want to hire African Americans.

reasonable inference that Olmanson or any other defendant acted with discriminatory intent. The invasion of privacy claim is baseless for reasons discussed below.

### e.   Equal rights complaints

It is undisputed that defendant Herje, a manager at the Division of Civil Rights in the Department of Workforce Development, refused to accept plaintiff's discrimination complaints. Defendants state that the complaints were rejected because Herje was following a 2002 State Personnel Commission order barring plaintiff from filing discrimination complaints until he reimbursed the state for legal costs incurred in defending against previous frivolous claims. Plaintiff brings two arguments is support of this component of his claim, but neither shows that this rationale is false or that Herje actually rejected them for discriminatory reasons.

In his complaint, plaintiff states he "has read several Governor Walker's speeches in which he discouraged state agencies from accepting discrimination complaints" and that those speeches "enabled and encouraged Herje . . . to discriminate against qualified Blacks." This vague statement does not provide specific enough information to even understand what Walker actually said in his speeches, does not show that Herje heard or read those speeches, and comes nowhere close to raising a reasonable inference that Herje was influenced into rejecting plaintiff's complaints.

Plaintiff provides the dismissal order from a state court case in which plaintiff sought an order directing the DWD to accept a discrimination complaint he had filed against PDQ Food Stores. He also provides the DWD's brief in that case, in which the state asked for dismissal because it agreed to belatedly accept plaintiff's complaint, acknowledging that the State Personnel Commission's sanctions order blocked plaintiff only from filing

26

discrimination complaints against state agencies, not private employers. I understand plaintiff to be arguing that this decision shows Herje intentionally incorrectly rejected his complaints, and that one could draw a reasonable inference that Herje's decision to act incorrectly must have stemmed from discriminatory animus.

These are not reasonable inferences from the evidence. The dismissal order was issued *after* Herje's rejections relevant to this lawsuit, so it is difficult to draw an inference that Herje rejected the complaints out of contempt for African Americans rather than a sincere but mistaken view of the sanctions order. In any event, there is no reason to think that Herje was incorrect in rejecting plaintiff's complaints against the DOC. The state court dismissal order stated that the parties stipulated to the dismissal, which I infer means that the court chose not to interpret the meaning of the Personnel Commission's sanctions order because the DWD agreed it was wrong to reject a complaint against a *private employer*. There is nothing in these documents creating a reasonable inference that sanctions order was ruled inapplicable to complaints against the DOC. Thus plaintiff cannot show that Herje was legally required to accept plaintiffs complaints against the DOC, and yet he intentionally ignored them.

### 2.    Direct method

Under the direct method of proving a discrimination claim, a plaintiff must produce either direct evidence or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action. *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008).

I start the direct method analysis by looking for direct evidence. Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it "uniquely reveals" the

employer's intent to discriminate. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005).

As discussed above, plaintiff asserts that that various state officials made statements that show overt racism, but he fails to provide any evidence that this is true, or that such statements were made by defendants in a position to affect the alleged discriminatory actions discussed in plaintiff's complaint. *See supra* at 26 (plaintiff does not explain the content of Governor Walker's speeches); note 8 (state's brief in temporary restraining order case does not contain any discriminatory statements). In addition, plaintiff says that "[t]here was a White attorney, his name Mark Saunders, who said that he and others could hurt Blacks males and nothing would be done to them as Whites" and that now-retired employee "Michael Losse called [plaintiff] a naturalized 'N' from Africa." Dkt. 63, at 62. Plaintiff does not support these proposed findings with any evidence; these statements are not included in his affidavit. Even if plaintiff had properly supported these findings, Saunders and Losse appear to be former state employees who had no involvement in any of the hiring decisions or other alleged discriminatory actions included in plaintiff's complaint, so their alleged statements do not support plaintiff's claims.

But plaintiff's failure to adduce admissible direct evidence of discrimination is not the end of the analysis. A more common method is proof by circumstantial evidence, "which suggests discrimination albeit through a longer chain of inferences." *Hasan*, 552 F.3d at 527 (internal citation omitted). A plaintiff can support his claim by "constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Koszola v. Bd. of Educ. of Chicago*, 385 F.3d

1104, 1109 (7th Cir. 2004) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Evidence that proves a claim under the direct method typically includes:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action.

*Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014) (citation omitted). A plaintiff need not produce evidence in each category to survive summary judgment. *See Darchak*, 580 F.3d at 631.

Plaintiff's evidence does not come close to creating a mosaic of discrimination, for the same reasons that the evidence does not show pretext under the indirect method of proving a discrimination claim. Also, throughout his summary judgment materials, plaintiff seems to be arguing that discretionary animus could be inferred at least in part by the fact that defendants took all of these actions in a context in which there were zero African Americans in classified positions "at DOC Headquarters." Dkt. 61, at 42. But he presents no proof this is true. In his brief, he states:

> This Court should remember that there were no Blacks in classified positions at DOC Headquarters at the time [he] applied and interviewed for the positions. [He] had gone there off and on for NAACP meetings; but he never saw Blacks at the DOC Headquarters. So there is no use to prove statistically.

Dkt. 60, at 17. In evaluating a discrimination claim under the direct method, I can consider evidence that is "not rigorously statistical." But plaintiff's evidence of how many African Americans are employed at DOC headquarters is not remotely statistical; it is merely a bald, unsupported assertion. Plaintiff has presented no direct or circumstantial evidence that

29

points *directly* to a discriminatory reason for the DOC's decision not to hire him. His claim fails under the direct method.

### 3.    Disparate impact

Plaintiff also argues that the interview process has a disparate negative impact on African American applicants. This type of claim is limited to his Title VII claim against the DOC; disparate impact cannot form the basis of an equal protection claim under § 1983. *See Washington v. Davis*, 426 U.S. 229, 239 (1976); *Bond v. Atkinson*, 728 F.3d 690, 692-93 (7th Cir. 2013).

Under a disparate impact theory, an employer is held liable when a facially neutral employment practice disproportionately impacts members of a legally protected group. *Reidt v. County of Trempealeau*, 975 F.2d 1336, 1340 (7th Cir. 1992). To establish a *prima facie* case under the disparate impact theory, "a plaintiff must isolate and identify the specific employment practices that are allegedly responsible for any observed statistical disparities." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1067 (7th Cir. 2003). The plaintiff must also present "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012) (internal quotations omitted). Plaintiff does not provide any statistical evidence that the interview process has an impact on the hiring of African American job candidates, so summary judgment must be granted to the DOC on this claim.

### 4.    Due process

Plaintiff also states that defendants violated his due process rights with regard to racial discrimination in the hiring process, but job applicants do not have a property interest in

appointment to a position, so summary judgment must be granted to defendants on this claim. *Petru v. City of Berwyn*, 872 F.2d 1359, 1363 (7th Cir. 1989) ("To recognize a 'property' interest for an appointment to a classified position in the realm of public employment would drastically extend the scope of the due process clause and we refuse to make that extension.").

### D.     Malicious prosecution

I understand plaintiff to be attempting to bring a malicious prosecution claim under § 1983 against defendants Olmanson, Walker, Van Hollen, and Hamblin for bringing the state court petition to enjoin plaintiff from applying for DOC jobs. However, allegations of malicious prosecution do not implicate a constitutional violation and are not actionable under 42 U.S.C. § 1983 unless no remedy for this conduct exists in state law. *See Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001) (explaining that "the existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution"). Because Wisconsin recognizes a cause of action for malicious prosecution, *see Strid v. Converse*, 111 Wis. 2d 418, 423, 331 N.W.2d 350, 353-54 (1983), plaintiff cannot maintain a constitutional claim for malicious prosecution under § 1983.

### E.     Invasion of privacy

Plaintiff asserts that defendant Olmanson violated his right to privacy by "engag[ing] in massive spying . . . using the internet to see what he was posting." Although courts have articulated a constitutional right to certain types of informational privacy, *see, e.g.*, *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977); *Denius v. Dunlap*, 209 F.3d 944, 955-56 (7th Cir. 2000), plaintiff falls far short of articulating any facts that would create a triable privacy claim. Olmanson presented a series of plaintiff's comments on the Huffington Post website in an

attempt to show that plaintiff was not seriously seeking work with the DOC. Both the limited authority available on the question and common sense dictate that a search for comments made on a public website is not an invasion of plaintiff's privacy. *United States v. Gines-Perez*, 214 F.Supp.2d 205, 225 (D. Puerto Rico 2002) ("[I]t strikes the Court as obvious that a claim to privacy is unavailable to someone who places information on an indisputably, public medium, such as the Internet, without taking any measures to protect the information."), *vacated on other grounds by United States v. Gines-Perez*, 90 F. App'x 3 (1st Cir. 2004).

## F.    Public accommodation

In his complaint, plaintiff states that defendants violated his right to public accommodation in two ways: (1) defendant Olmanson tried to keep plaintiff out of DOC facilities by filing the lawsuit for a restraining order; and (2) defendant Herje refused to accept plaintiff's discrimination complaints. After defendants raised several arguments for dismissing these claims in support of their motion for summary judgment, plaintiff now backs off of those claims, stating that the use of the term "public accommodation" was a "misnomer." Dkt. 60, at 28. This seems wise given that there is nothing in Title II of the Civil Rights Act stating that access to government buildings or discrimination complaint procedures are covered by that law. *See Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1269 (7th Cir. 1993) (42 U.S.C. § 2000a(b) "delineates the entities included therein as places, establishments, lodgings, and facilities"). The court will grant summary judgment to defendants on plaintiff's public accommodation claim.

G.      **State law claims**

This leaves plaintiff's state law claims, which are somewhat vaguely expressed, but seem to be claims for violation of the Wisconsin Constitution or state statutes analogous to the federal claims already discussed above. The general rule is that district courts should relinquish jurisdiction over state law claims when all the federal claims are dismissed before trial. But a district court has discretion to decide the state law claims "for good reasons," *Whitely v. Moravec*, 635 F.3d 308, 311 (7th Cir. 2011), including if the resolution of the state law claims is clear. *Cortezano v. Salin Bank & Trust Co.*, 680 F.3d 936, 941 (7th Cir. 2012). In this case, the undisputed facts make it clear that plaintiff cannot succeed on his state law claims, so I will retain jurisdiction and grant summary judgment to defendants on these claims.

Defendants argue that the state claims must be dismissed because plaintiff did not comply with Wisconsin's notice of claim statute, Wis. Stat. § 893.82, which states in relevant part:

> no civil action or civil proceeding may be brought against any state officer, employee or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's, employee's or agent's duties . . . unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names of persons involved, including the name of the state officer, employee or agent involved.

Strict compliance with the notice of claim statute is a condition precedent to bringing a civil action against a state officer or employee. *Kellner v. Christian*, 197 Wis. 2d 183, 195-96, 539 N.W.2d 685, 690 (1995); *see also* Wis. Stat. § 893.82(2m) ("No claimant may bring

an action against a state officer, employee or agent unless the claimant complies strictly with the requirements of this section.").

The parties agree that plaintiff served a notice of claim on September 4, 2013, *see* Dkt. 50-1, but given that date of service, the only claims covered by this notice are claims that accrued after May 7, 2013. Plaintiff argues that he filed an earlier notice of claim, dated September 15, 2012, and he has submitted that document. Dkt. 61-1, at 21. But I will disregard this document because it is clearly fraudulent. Not only is the signature block not dated or notarized (as well as not containing his usual signature, only markings that resemble ditto marks), but the events plaintiff discusses in that notice relate to his application for a *2014* job application with the DOC.

The only events that arguably fit within the time period for plaintiff's authentic notice of claim are plaintiff three 2013 job applications and Herje's rejection of plaintiff's July 2013 equal rights complaint. But the notice fails to strictly comply with § 893.82 with regard to his claims related to his job applications because he does not specifically name which defendants violated his rights concerning these decisions.[10] Although plaintiff names Herje with regard to his claims about the rejection of his equal rights complaint, he fails to comply with § 893.82 by failing to give the date of that rejection.

Even if plaintiff had complied with the notice of claim statute, his claims would fail on the merits. As stated above, plaintiff fails to present any evidence suggesting that he was

---

[10] Defendants also argue that plaintiff's claims about the job applications fail to comply with § 893.82 because plaintiff gives only the dates of his job applications, rather than the dates the actual hiring decisions were made. I am not convinced that plaintiff needs to identity the dates of the internal decisionmaking process when it seems that he believes that the interviews themselves were part of the discriminatory hiring process. In any event, it is unnecessary to resolve this question.

discriminated against in his job applications. As for his claim against Herje, plaintiff backs off his "public accommodation" rationale and instead argues that Herje violated Wis. Stat. § 111.38, which states that the DWD "shall: (1) Investigate the existence, character, causes and extent of discrimination in this state and the extent to which the same is susceptible of elimination" and § 111.39(4)(a), which states in part that "[t]he department shall employ such examiners as are necessary to hear and decide complaints of discrimination and to assist in the effective administration of this subchapter." However, as defendants argue, plaintiff does not have a private cause of action against Herje under these statutes. "[A] private right of action is only created when (1) the language or the form of the statute evinces the legislature's intent to create a private right of action, and (2) the statute establishes private civil liability rather than merely providing for protection of the public." *Grube v. Daun*, 210 Wis. 2d 681, 689, 563 N.W.2d 523, 526 (1997). There is no language in the statutes suggesting that plaintiff may bring a claim against Herje for failing to follow them, nor can I find any legal authority supporting the type of claim he wishes to bring.

## FUTURE CASES

As explained above, the Seventh Circuit has barred plaintiff from filing civil actions in this court. But that sanction does not prevent plaintiff from wasting the time and resources of the court and the opposing parties in the cases that are removed. In light of plaintiff's long history of frivolous litigation, I find that it is appropriate to modify the way this court handles civil cases brought by plaintiff in state court that are removed to this court.

Going forward, if a state-court case filed by plaintiff is removed to this court, the court will issue an order to plaintiff to present the evidence he believes supports his claims, as if he

35

were filing proposed findings of fact in support of a motion for summary judgment. The court will screen plaintiff's submission to determine whether a reasonable jury could conclude that plaintiff's rights were violated. If so, the case will proceed under the terms of the previous sanction, under which plaintiff may not file motions proactively. If plaintiff's submissions do not produce evidence that could sustain his claims, the case will be dismissed at the outset, without the need for defendants to file a summary judgment motion. As the Seventh Circuit sanctions order states, this will not apply to filings in criminal or habeas corpus actions. Should the Seventh Circuit lift its sanctions order against plaintiff, the terms of this sanction will also be lifted.

ORDER

IT IS ORDERED that:

1.   Defendants' motions to supplement their motion for an order to show cause, Dkt. 36, 38, are GRANTED.

2.   Defendants' motion for an order to show cause and for protective order, Dkt. 32, is DENIED.

3.   Plaintiff's motion to file a sur-reply to defendants' motion for summary judgment, Dkt. 65, is GRANTED.

4.   Defendants' motion for summary judgment, Dkt. 43, is GRANTED. The clerk of court is ordered to enter judgment in favor of defendants.

5.      This court's procedure for handling civil actions filed by plaintiff in state court but removed to this court is modified as stated in the opinion above.

Entered August 13, 2015.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge